LEWIS, J.
Elizabeth McDonald Demont, the former wife, appeals, and Michael E. Demont, the former husband, cross-appeals certain rulings in the trial court’s amended final judgment dissolving their marriage. The *1098 wife asserts that the trial court erred as a matter of law and abused its discretion in awarding her bridge-the-gap alimony and nominal permanent alimony, and that the court abused its discretion in failing to account for the husband’s expenditure of certain funds during the pendency of the dissolution proceedings. The husband asserts error as a matter of law in the court’s de facto treatment of a future non-compete/non-solicitation payment of $165,000 from his former employer as a marital asset. We reverse the designation of the $165,000 final payment as a marital asset and remand for the trial court to adjust the equitable distribution plan accordingly. We affirm the amended final judgment in all other respects.

FACTS & BACKGROUND

The parties were married in November 1989 and separated in Spring 2008. The divorce proceedings commenced with the October 2007 filing of the petition for dissolution. The parties have three children, born in February 1991, December 1992, and May 1999. After the trial court issued the amended final judgment in July 2009, an appeal and cross-appeal culminated in our dismissal of the proceedings as premature because the circuit court had reserved jurisdiction over certain material matters. See Demont v. Demont, 24 So.3d 699 (Fla. 1st DCA 2009). Now that the trial court has issued a supplemental judgment ruling on the outstanding issues, all the issues raised by the parties are properly before us.
The parties’ employment and financial history and their marital standard of living are key to understanding the trial court’s challenged rulings on alimony and equitable distribution. The husband, born in May 1955, earned undergraduate and law degrees and worked in commercial litigation for several Jacksonville law firms after his 1982 graduation. In 1996, he accepted an executive management position (president) at Suddath Van Lines (Sud-dath), a national moving and storage company and a former legal client. Although the new position involved a significant pay cut initially, the husband subsequently received generous compensation, bonuses, and fringe benefits. In November 2008, however, Suddath eliminated the husband’s position, due partly to the economic downturn and partly to the high cost of his salary and expenses. In connection with his termination by Suddath, the husband was subject to an “Employment Resignation Agreement, Non-Compete, Waiver and Release” pursuant to which his company car, a 2005 Lexus 400, was transferred to him. The timing, nature, and amount of the various payouts arising from this agreement are pertinent to the issues on appeal and cross-appeal and will be discussed as appropriate.
Rather than accept another job in the moving and storage business of uncertain longevity that would have required the family to leave Jacksonville, the husband returned to a former employer, the Smith, Hulsey law firm, in December 2008 as a non-equity attorney in commercial litigation, earning $220,000 per year, or substantially less than he had earned at Sud-dath. The husband testified that at Smith, Hulsey, he was not guaranteed a bonus but could become eligible for additional income, depending on his own and his employer’s annual performances.
The wife, born in October 1961, earned a bachelor’s degree in business administration. After graduation, she worked as a credit card analyst and a records custodian at a bank and as a litigation paralegal at a law firm during the period from 1985 to the early 1990s. While the parties’ children were young, the wife worked occasionally as an uncertified substitute teach *1099 er and in a data entry position. By the parties’ mutual agreement, however, she forewent full-time, paid employment to devote her efforts to parenting, homemaking, and school volunteering activities. From 1998 forward, she was extensively involved in cultural and charitable community endeavors. She worked briefly as a mortgage loan officer and as an interior design assistant. The wife’s commitment to maintaining the home front and establishing the couple’s status in civic and social circles — during a period when the husband was working long hours, establishing his professional reputation, and traveling frequently — contributed to his career advancement.
In January 2008, or shortly before the parties’ separation, the wife requested temporary support and exclusive use and possession of the marital residence. The husband opposed the motion, based partly on the wife’s alleged overspending and partly on her financial need to return to full-time, paid employment. A consent order granted the wife and children exclusive use and possession of the marital home and granted the husband exclusive use and possession of his rented residence. After an evidentiary hearing, the trial court issued a July 22, 2008, order on temporary needs, intended to be of limited duration and premised on the expectation that the dissolution trial would commence in 90 days.
During the interim period before trial, the husband was ordered to continue paying the mortgage on the marital residence ($6,480 a month); the home utilities, cable television, and Internet bills; the wife’s BMW car payments; a child’s Tahoe vehicle payments; all automobile, life, and disability insurance premiums; the parties’ Bank of America credit line; and the country club monthly bills. These expenses totaled approximately $9,668 monthly. The husband was also directed to continue paying the family’s dental, health, and vision insurance through payroll deduction. Additionally, the court ordered the husband to pay in cash $1,000 each pay period, or $2,000 a month, directly to the wife for food, home operating expenses, gasoline, clothing, cell phones, and other essentials. While expressly acknowledging that these financial demands would leave the husband with only about $1,000 in regular monthly income for his own needs, the court found that he “receives the benefit of a significant bonus each year.” Although a series of delays postponed the dissolution trial until mid-May 2009, well after the anticipated expiration of the “temporary” support order, the parties remained bound by the terms of the order. After receiving extensive testimony and documentary evidence, the trial court entered the amended final judgment of dissolution of marriage.
In fashioning an equitable distribution under section 61.075, Florida Statutes (2009), the trial court set valuations and included as the primary marital assets the McGirts Boulevard marital residence ($1.4 million, subject to a $942,000 mortgage), Suddath stock appreciation rights (SAR) due ($707,076), a Suddath payout due in March 2010 ($165,000), a Suddath 401(k) account ($88,062), children’s accounts (approximately $25,000), and a 2005 BMW ($22,640, on which $20,000 is owed). Commencing August 2009, any monthly mortgage payments due on the marital residence were to be paid 50-50 by the parties, with additional contributions to be made by the parties for real estate taxes if the residence was not sold by December 31, 2009. The parties were to divide equally the installment payments received from Suddath and to bear equal responsibility for the remaining debt on the BMW. They were ordered to divide equally the Raymond James children’s account and one child’s 529 account, unless *1100 the parties agreed in writing to leave those accounts intact for the children’s benefit. The court acknowledged that once the marital residence is sold and the other assets are divided, the equitable distribution will provide a substantial amount of money to each party.
To calculate child support under section 61.30, Florida Statutes (2009), the court listed the parties’ gross monthly incomes as $18,333 ($10,468 net) for the husband and $4,050 ($3,900 net) for the wife. Given the parties’ combined net monthly income of $14,368 and their respective earning shares of 73% and 27%, the court found the minimum support for two children was $2,556, of which the husband would be responsible for paying $1,900. The court expressly declined to impute income to the wife, given the uncertainty as to if, and when, the wife will be able to secure gainful employment at the earnings level suggested by the vocational rehabilitation counselor. The wife and children are listed as beneficiaries on the husband’s $1,250,000 life insurance policy.

ISSUES

I. Alimony

In her pleadings, the wife requested temporary and permanent periodic alimony, citing myriad factors: the parties’ lavish marital lifestyle; their approximately 18-1/2-year marriage; their mutual agreement for the wife to forgo outside, paid employment and to devote herself full-time to homemaking, parenting, supporting the husband’s career-building goals, and establishing the couple’s position in civic and social endeavors; her significant financial needs; and the husband’s ability to pay. The trial court recognized the obvious: given the husband’s significantly reduced annual income after leaving Suddath, the parties’ having to maintain separate residences, and the onerous effect of the parties’ recurring and rising expenses for lifestyle items (including the elegant waterfront marital residence, private school tuition, upscale automobiles, and a nice fishing boat), the parties will no longer be able to maintain their extravagant marital lifestyle and patterns of overspending and borrowing. They will have to sell the marital residence, and the wife will have to obtain paid, full-time employment.
A vocational rehabilitation counselor, John Roberts, testified in a May 2009 deposition that he had met the wife in October 2008. He described her as an articulate, well-groomed, and professional individual with a solid education, a pleasing personality, and proven sales ability. Roberts stated that the wife’s 1988 earnings of $28,000 would approach $40,000 in 2009 terms if adjusted for inflation. He noted that while caring for the children, the wife had volunteered 30 hours a week at an art museum and had chaired a children’s hospital antiques show, sometimes working 50-60 hours a week coordinating committees and planning special events. Roberts testified that he had found about a dozen jobs in the Jacksonville market suitable for the wife’s experience and skills'. He opined that in the current economy, the wife’s highest earning capacity would be $40,000-$50,000 in the banking or sales fields. Roberts had performed a labor market survey listing specific employers with jobs available within that salary range. Roberts based his earnings assessments partly on the wife’s success for two months in 2008 selling subscription packages for the Jacksonville Symphony Orchestra to prior identified patrons who would receive a charitable or tax benefit. Admittedly, the earnings range was based on the wife’s perceived sales skills rather than on her actual income history.
*1101 The wife testified that she had prepared resumes, contacted prospective employers, and participated in job interviews, thus far to no avail. Finding the wife is a suitable candidate for permanent alimony, while recognizing the parties’ dire financial circumstances until the marital home is sold, the trial court devised a short-term plan. The court determined that the wife’s monthly needs were approximately $4,000, excluding the mortgage payment, property insurance, the children’s tuition, and certain miscellaneous expenses. Specifically considering the expensive unsold marital home and the wife’s inability so far to secure full-time, paid employment, the trial court awarded her bridge-the-gap alimony in the amount of $4,000 monthly, commencing July 1, 2009, and continuing for two years or until further order. The court also awarded her permanent alimony in the nominal amount of $50.00 a month and continuing until her remarriage, either party’s death, or a further court order. Although the temporary support order placed the entire burden of monthly mortgage payments on the husband, the amended final judgment ordered the wife to pay one-half ($3,150.00) of the mortgage payment. The court noted that if the marital residence sells and the wife obtains full-time, paid employment before the gap period ends, the court might need to consider (upon a proper petition) a modification of alimony and child support. The court declined to impute income to the wife because it was uncertain whether she would be able to obtain full-time employment at the pay level estimated by the vocational rehabilitation counselor. In the first issue on appeal, the wife complains that the trial court failed to apply the presumption in favor of permanent alimony after a long-term marriage, that the bridge-the-gap award is unwarranted and inappropriate for her financial circumstances, and that the award of only nominal permanent alimony is grossly inadequate.
Attempting to avoid the deferential “abuse of discretion” standard of review described in Canakaris v. Canakaris, 382 So.2d 1197, 1202 (Fla.1980), the wife contends that the trial court erred as a matter of law by failing to apply the correct legal rule in awarding bridge-the-gap alimony and only nominal permanent alimony. See Ondrejack v. Ondrejack, 839 So.2d 867, 870 (Fla. 4th DCA 2003). She premises her legal argument on two grounds: (1) that bridge-the-gap alimony “is a useful tool in a relatively small category of divorces” but is inappropriate, given the facts of this case, see Borchard v. Borchard, 730 So.2d 748, 753 (Fla. 2d DCA 1999); and (2) that nominal permanent alimony is improper, given the parties’ long-term marriage and the wife’s acute financial needs. See Hill v. Hooten, 776 So.2d 1004, 1007 & n. 3 (Fla. 5th DCA 2001) (characterizing a 17-year marriage as long-term); Cruz v. Cruz, 574 So.2d 1117, 1118 (Fla. 3d DCA 1990).
It is well-established in Canakaris and its progeny that “[a] trial court has considerable discretion in determining an award of alimony.” Engesser v. Engesser, 42 So.3d 249, 250 (Fla. 5th DCA 2010). As the party seeking alimony, the wife had the burden to prove her financial need and the husband’s ability to pay. See Esaw v. Esaw, 965 So.2d 1261, 1266-67 (Fla. 2d DCA 2007). We find nothing in the record to support the wife’s conclusion that the trial court misconstrued the burden, of proof. Although section 61.08(1), Florida Statutes (2009), does not expressly provide for bridge-the-gap alimony, subsection (2) sets out a non-exclusive list of “relevant economic factors” for determining a proper award of alimony and permits the trial court to “consider any other factor necessary to do equity and justice between the *1102 parties.” In Shea v. Shea, 572 So.2d 558, 559-60 (Fla. 1st DCA 1990), we recognized that in some circumstances, even if a spouse is employable, an alimony award effectively rehabilitating the spouse in making the transition from married life to single status can be justified as a “bridge-the-gap measure.” Accord Vanbrussel v. Vanbrussel, 710 So.2d 170, 172 (Fla. 1st DCA 1998); Iribar v. Iribar, 510 So.2d 1023, 1024 (Fla. 3d DCA 1987).
The trial court relied on evidence that the wife is capable of securing gainful, full-time employment even in a declining economy but, in the interim period before getting a job, will be wholly dependent on the husband’s financial support. In so doing, the court assessed the instant facts as justifying a bridge-the-gap award of $4,000 monthly for 24 months. The above-cited decisions contradict the wife’s conclusion that the present case lies beyond the narrow scope of cases where bridge-the-gap alimony is proper. The wife misplaces her reliance on cases such as Alcantara v. Alcantara, 15 So.3d 844 (Fla. 3d DCA 2009), in which the trial court abused its discretion by awarding only bridge-the-gap alimony, rather than permanent alimony, after a 19-year marriage. See also Wofford v. Wofford, 20 So.3d 470 (Fla. 4th DCA 2009) (finding an abuse of discretion in trial court’s awarding only bridge-the-gap alimony in the amount of $1,200 monthly for two years, rather than some amount of permanent alimony, after an 11-year marriage, where the husband’s net monthly income was $9,026 while the wife, who had worked sporadically during the marriage pursuant to the parties’ agreement that she would be a homemaker and care for the children, was seeking employment paying $10.00 hourly and was unemployed at the time of the final hearing). We cannot say that the trial court abused its discretion in fashioning this time-limited award to account for the parties’ uncertain, evolving financial circumstances.
The trial court correctly determined that the wife is entitled to permanent alimony as well. The husband does not dispute this finding. “Permanent periodic alimony is used to provide the needs and necessities of life to a former spouse as they have been established during the marriage,” and in deciding whether to award permanent periodic alimony, “the court must consider the needs of the spouse requesting the alimony and the ability of the other spouse to make alimony payments.” Zeigler v. Zeigler, 635 So.2d 50, 53 (Fla. 1st DCA 1994); Canakaris, 382 So.2d at 1201-02. The marital standard of living is a less useful guide for determining an alimony award in situations, like the present case, where the parties maintained a lavish marital lifestyle only by incurring considerable debts. See Jaffy v. Jaffy, 965 So.2d 825, 827-28 (Fla. 4th DCA 2007); Nichols v. Nichols, 907 So.2d 620, 623 (Fla. 4th DCA 2005).
Faced with the evidence that the parties had lived beyond their financial means, that they had not yet sold their most substantial asset (the $1 million-plus marital residence), that the wife had not yet obtained full-time employment, and that the husband was settling into a new job (paying substantially less than Suddath) while footing the entire bill for the parties’ expenses, the trial court understandably concluded that determining an appropriate amount of permanent alimony would be difficult for so long as the parties’ financial circumstances remain in flux. On this basis, the court awarded the wife only $50.00 monthly in permanent alimony.
The wife correctly notes that even when she secures full-time employment, she will not necessarily be self-supporting. See Wolff v. Wolff, 576 So.2d 852 (Fla. 1st DCA 1991). The trial court’s rulings on alimony *1103 do not suggest otherwise. The court was faced with a situation where the wife clearly needs permanent alimony and the husband is obligated to pay the lion’s share of the family’s sizeable debt. Devised under these circumstances, this nominal amount of permanent alimony serves two important and salutary purposes. First, as the judgment expressly recognized, this award will allow the wife to petition the trial court for a future increase in permanent periodic alimony if she proves a greater need, if and when the husband’s financial position improves. Second, it preserves the trial court’s jurisdiction to revisit this matter if the parties’ respective financial circumstances change substantially, as the record suggests will happen. See Gergen v. Gergen, 48 So.3d 148, 150-51 (Fla. 1st DCA 2010); Biskie v. Biskie, 37 So.3d 970, 973 (Fla. 1st DCA 2010); Schmidt v. Schmidt, 997 So.2d 451, 454 (Fla. 2d DCA 2008); Nourse v. Nourse, 948 So.2d 903, 904 (Fla. 2d DCA 2007). Because the wife has shown no abuse of discretion, we affirm the alimony awards while recognizing the trial court’s clear willingness to review this issue in the event of changed financial circumstances.

II. Allegations of the Husband’s Dissipation of Marital Funds

In the second issue on appeal, the wife contends that the trial court erred by failing to account for the husband’s alleged excessive personal expenditures of marital funds while the dissolution proceedings were pending. The parties agree that we review this issue for an abuse of discretion. See Rabbath v. Farid, 4 So.3d 778, 781 (Fla. 1st DCA 2009) (revised opinion) (finding no abuse of discretion in trial court’s finding dissipation of marital assets). It is well-established that “[a] spouse may not deplete marital assets prior to a dissolution hearing unless he or she can show the withdrawals were minimally necessary to meet reasonable living expenses.” Steedman v. Chenoweth, 27 So.3d 78, 80 (Fla. 1st DCA 2009). The wife correctly notes that in the amended final judgment, the trial court found that thousands of dollars were spent on non-essential family items such as the children’s lavish gifts for special occasions and their extracurricular activities, entertainment, and allowances. The husband also paid substantial amounts toward restaurant and country club bills, professional clothing expenses, the collecting of fine wines, and weekends at Ponte Vedra Beach and Fernandina Beach. The court observed, however, that to the extent the husband’s largesse benefitted the children, the wife knew of these expenditures and neither objected to his generosity nor acted so as to effect any significant reductions in the extravagant lifestyle the parties enjoyed during the marriage. In fact, the wife’s financial affidavit listed over $21,000 in monthly expenses.
The husband produced detailed credit card and bank account records that support the wife’s assertion that he spent a significant amount of marital funds. At the dissolution trial, the wife contended that the husband misspent and dissipated a large portion of these monies for his own personal enjoyment. The husband’s testimony explained, however, that he incurred many of these personal expenses as a result of (1) having to upgrade his wardrobe for the transition from more casual working clothes at Suddath to the more professional, higher-quality attire appropriate for a large law firm practice; (2) entertaining actual and potential clients (for which his employer reimbursed him); (3) taking the parties’ children to restaurants on weekends and during other visitation periods; (4) entertaining the family and friends at the country club; and (5) enjoying an occasional weekend vacation. The husband shouldered a heavy financial burden under *1104 the terms of the standing “temporary” support order. Most of the husband’s expenditures questioned by the wife paid for the usual and customary household and other family expenses, as established by the parties themselves during the marriage. Because competent, substantial evidence supports the conclusion that the husband did not dissipate marital funds during the pendency of the dissolution proceedings, we find no abuse of discretion in the court’s conclusions. See Pubillones v. Lyons, 943 So.2d 881, 882 (Fla. 3d DCA 2006) (on mot. for reh’g).

III. Final Installment of Suddath Non-Compete Payment

In the cross-appeal, the husband asserts error as a matter of law in the trial court’s effectively treating the $165,000 gross final installment of the non-compete payments from Suddath — not due until March 2010 — as a marital asset subject to equitable distribution under section 61.075(1), Florida Statutes (2009). The husband also challenges the court’s conclusion that he failed to explain where certain payouts received from Suddath went. “Marital assets” are “[a]ssets acquired ... during the marriage, individually by either spouse or jointly 'by them.” § 61.075(6)(a)1.a., Fla. Stat. (2009); Heinrich v. Heinrich, 609 So.2d 94, 95-96 (Fla. 3d DCA 1992). The initial determination as to whether an asset is marital or non-marital is a fact-finding process. See O’Leesky v. Liggett, 544 So.2d 268, 269 n. 1 (Fla. 2d DCA 1989); Macaluso v. Macaluso, 523 So.2d 615, 617 (Fla. 2d DCA 1988). The ultimate conclusion that an asset is marital and therefore subject to equitable distribution is a question of law, subject to de novo review. See Farrior v. Farrior, 736 So.2d 1177, 1179 (Fla.1999); Finney v. Finney, 995 So.2d 579, 580 (Fla. 1st DCA 2008); Smith v. Smith, 971 So.2d 191, 194 (Fla. 1st DCA 2007).
In the process of terminating the husband’s lucrative position at Suddath in November 2008, the employer and he entered a comprehensive waiver and release agreement that provided for Suddath to make generous installment payments to him for several different purposes. Under an informal deferred compensation agreement, the husband was entitled to receive SAR payments, as well as general severance payments. The SARs were originally intended to be part of the husband’s retirement benefit, but if his employment with Suddath ended, he was contractually obligated to sell them back to the company at an established value. His stock in the holding company had a book value (as of December 31, 2007) of more than $800,000. One of the SAR payments received during the marriage was in the amount of $176,000 ($112,000 net). The husband negotiated to receive certain other payments in exchange for his agreement neither to seek future employment in competition with Suddath nor to solicit Suddath’s customers or employees: $100,000 ($63,000 net) received in November 2008, $185,000 ($110,000 net) received in March 2009, and a final payment of $165,000, due to be received in March 2010. To show how these installment payments coincide with the dissolution proceedings, we note that in October 2007, the husband petitioned to dissolve the parties’ marriage. The trial court issued a final judgment dissolving the marriage in July 2009.
The husband concedes that the SAR and severance payments he received from Sud-dath, as well as the March-April 2008 payments received relating to his 2007 bonus, are marital assets. He contends, however, that unlike the SAR and severance payouts, which were based on his past labor and services to the employer during the marriage, the payments he received for agreeing not to compete with Suddath or *1105 solicit its employees were compensation based entirely on his promises regarding future, post-employment (and post-petition) conduct. The $165,000 non-compete installment was not due to be paid to the husband until March 2010, well after the trial court dissolved the marriage.
In its amended final judgment, the trial court determined that the vast majority of the money the husband received from Sud-dath in the form of SAR, general severance, and non-compete/non-solicit payouts was used to pay property taxes, to pay down other family debts, to pre-pay certain ongoing family expenses such as the pleasure boat payments and the children’s private school tuition, and to provide lavish gifts, entertainment, and restaurant visits for the children, all with the wife’s tacit approval. The husband testified that he had received two installments for his Sud-dath bonus, based on the company’s 2007 performance. The first bonus check, in March 2008, was for $127,000 gross, but after the employer deducted amounts for taxes, Social Security, Medicare, and $25,000 for an advance it had made to the husband, the net amount was approximately $65,000. At the “temporary” support hearing, the husband testified that these bonus funds were spent on family or household bills, including property taxes on the marital home, back-taxes, a child’s orthodontal fees, and private school tuition, as well as a six-month pre-payment of the rent for the residence the husband occupied after leaving the marital home, in exchange for which his landlord agreed to reduce the. overall rent amount and to carry a note for the balance due. Suddath paid the second bonus in April 2008, $59,535.00, but after certain deductions, the net figure was $43,787.00. This money was used to pay for the children’s tuition, marital home repairs and maintenance, and a buy-out of the lease on the wife’s BMW automobile.
The trial court characterized as “unexplained” the husband’s use of the bonus received in March-April 2008 (for his 2007 labors) as well as the alleged $63,000 net first non-compete payment received in December 2008. The court adjusted the equitable distribution, in effect “replacing” the initial $112,000 SAR net payment with the $165,000 gross final non-compete/non-solicitation payment. The husband correctly notes that he presented detailed, generally unrebutted evidence (at the temporary needs hearing and at the dissolution trial) regarding the parties’ bank accounts, his deposits of the various payouts from Suddath, credit card debts, canceled checks, and his expenditures for his own and the family’s needs. The husband testified that he deposited the net amount of the first non-compete/non-solicit installment payment into the parties’ joint operating bank account, and then applied most of it to paying off family and household bills.
Although an appellate panel should not disturb the fact-finder’s determinations regarding witness credibility and the weight of any conflicting evidence, see Ludlum v. Rothman, 503 So.2d 974, 975 (Fla. 4th DCA 1987), we are unable to discern any factual basis for the trial court’s conclusion that the husband’s use of these monies was unexplained. Even though the trial court clearly was authorized not to believe the husband’s testimony regarding how he had used marital funds, we find no record support for the trial court’s conclusion that the destination of the net $63,000.00 was unexplained. To the extent that competent, substantial evidence supports the trial court’s factual findings that the husband “volitionally” and “unilaterally” pre-paid certain significant, ongoing family financial obligations and provided generous gifts and entertain *1106 ment to the children without the wife’s objection, we see no legal reason why the parties together should not bear the financial consequences of their mutually agreed spending patterns and depletion of marital funds to pay off family expenses.
This compels reversal of the trial court’s decision effectively finding that the contracted March 2010 gross installment payment under the non-compete/non-solicit agreement is a marital asset to be considered in the equitable distribution scheme. The trial court found that the husband received approximately $176,000 ($112,000 net) as the first SAR installment payment, which he deposited into a bank account and spent unilaterally, albeit without any serious objection by the wife. After expressly addressing the expected $165,000 non-compete/non-solicitation installment, the trial court found “that the voluntary severance payments could also be considered as marital assets in the form of retirement.”
Challenging this finding, the husband correctly notes, first, that Suddath’s termination of his position was not voluntary on his part. The employer, suffering financially from the economic downturn and wanting to reduce the substantial expenses associated with the husband’s salary, bonuses, and fringe benefits, let him go. Second, the non-compete/non-solicit payouts, which were promised in exchange for the husband’s agreement to forbear from certain future conduct, are substantively different from typical severance payments, which are
like other benefits afforded to employees as part of a welfare or social security type scheme that are not given as payment for services rendered by an employee. Instead, they are considered employment ‘entitlements’ which are given because of a perceived social or moral obligation to financially assist an employee when he or she is unable to work because of ... layoffs.
Bradshaw v. Pantry Pride Ent., Inc., 566 So.2d 1306, 1808 (Fla. 3d DCA 1990). Third, in no reasonable way can the non-compete/non-solicit payments be described as “like retirement.” The husband correctly argues that payment to an employee to honor a covenant not to compete is not a retirement fund based on past labor and services. This agreement pre-supposed that the husband would not engage in post-termination competitive practices against the employer. The non-compete/non-solicit agreement did not compensate the husband for past work performed for Suddath during the marriage, which might constitute marital labor and thus be deemed a “marital asset” subject to equitable distribution. The final non-compete/non-solicitation payment — which the husband was not to receive until March 2010, or long after the petition for dissolution was filed and the marriage was dissolved — is not comparable to deferred income or a stock option where a spouse’s rights vested during the marriage. Accordingly, the $165,000 payment should not have been treated as a marital asset subject to equitable distribution.
For the foregoing reasons, we REVERSE that portion of the amended final judgment effectively treating the $165,000 final non-compete/non-solicit payment from Suddath as a marital asset subject to equitable distribution and REMAND for the trial court to adjust the equitable distribution accordingly. We AFFIRM the judgment in all other respects, including the awards of bridge-the-gap alimony and nominal permanent alimony.
VAN NORTWICK and CLARK, JJ., concur.